F. F. McElhinney, Appellant, v. J. J. Rainbow, Auditor, Appellee.

**TAXATION:** Valuation—Corporate Stock—Evidence. A single sale by the corporation of corporate stock may not necessarily furnish a correct standard from which to determine the actual value of said stock for taxation purposes. Evidence reviewed, and held insufficient to sustain the value as found by the trial court.

*Appeal from Black Hawk District Court.*—Geo. W. Dunham, Judge.

Monday, March 12, 1917.

Appeal from an order of the district court fixing a valuation upon certain shares of corporation stock for the purpose of assessment and taxation. The proceeding originated with the county auditor, who listed and assessed such shares against the appellant as omitted property under the provisions of the statute. From such action of the auditor, the appellant appealed to the district court, where

he obtained partial relief. Being still aggrieved, he has appealed again.—*Modified and Affirmed.*

*George E. Pike,* and *Edwards, Longley, Ransier & Smith,* for appellant.

*Mears & Lovejoy, McCoy & McCoy,* and *A. G. Kissel,* for appellee.

Evans, J.—It appears from the record TAXATION : valuation: corporate stock: evidence. before us that the trial in the district court involved the valuation of stocks in several corporations. For the purpose of this appeal, however, all of these are eliminated save the stock of the Iowa Mausoleum Company. The question at issue is the valuation of the stock of such company as of January 1, 1911. It is the contention of appellant that such stock was of no value whatever, whereas the trial court fixed upon it the valuation of 50 cents on the dollar. The plaintiff held on such date 576 shares of the stock, of a par value of $100 per share. The trial court fixed the actual market value of the same at $28,800, and appellant's assessment was fixed accordingly. This company was organized under the laws of South Dakota in 1908 or 1909, with a paid-up capital of $150,000. It exchanged its entire issue of stock for a certain license or patent right covering the territory of the state of Iowa, which license purported to give it the exclusive right for the state of Iowa to use a certain plan of construction of a mausoleum, containing so-called "crypts" for burial purposes. Shortly thereafter, it purchased from the same licensor an exclusive license for 17 additional states, at an agreed price of $300,000, to be paid for partly by the issue of its own stock and partly in cash. It thereupon increased its capital stock to $500,000, and delivered $250,000 of the new stock so issued in part payment for the 17 states, and paid, or agreed to pay, the further sum of $50,000 in cash. The main energies of the management appear to have been exerted in the direction

of selling territory, and many agents were employed and much expense incurred in that direction. Quite a number of mausoleum buildings were built in different localities in the state of Iowa, and all were built at a loss. Sales of several states came near to consummation, but none were actually consummated. In each attempted case, the company was left with a large bill of expense and a law suit. An apparent exception to this statement appears in the case of the state of Minnesota, which was said to have been sold for $100,000. Such sale, however, was apparent rather than real. The Iowa company through its officers organized a Minnesota company, to whom it sold the state of Minnesota for the purported consideration of $100,000, wholly payable in stock of the company so organized. Nothing ever came from such attempted enterprise. Up to January 1, 1911, the company had never made a dollar, and had never declared a dividend. Its one principal asset was its patent right. It did also own a number of mausoleum buildings in different parts of the state, the "crypts" of which were only partially sold. It was indebted in the sum of $150,-000. The subsequent history of the company is entirely consistent with this survey as of January 1, 1911. The company ceased to do business, and its creditors filed bankruptcy petitions against it, and such proceedings are now pending. The general situation of this company was very concisely put by the trial judge in the written opinion filed by him in the decision of the case, as follows:

"The plaintiff is shown to have owned on January 1st, 1911, 576 shares of stock in the Iowa Mausoleum Company. This stock was assessed by the county auditor, and was one of the issues on which this appeal was taken. From the circumstances surrounding the business of this corporation, the court finds it very hard to arrive at a satisfactory opinion with reference to the actual value of this stock on the first day of January, 1911. The corporation was evi-

dently at that time a going concern, although the result of its work and manipulation, as shown by subsequent events, might lead a person to believe that it was nearly gone, and that its stock at that date could in fact have had little or no value.  About the only fair test of the value of these stocks at that time would probably be the market value, if any, as expressed in sales made at or about that time.  Considerable testimony has been introduced with reference to sales made under guaranty, or under contract for employment, and only one sale that the court now remembers was shown wherein the stock was apparently sold on its merit. In the other transactions, the parties were evidently trafficking among themselves and attempting to crowd the stock out.  The value in the deals might very reasonably have been found to be either in the guaranty or the benefits to be derived from the contracts of employment.  The sale, however, to the Shallenbergers appears to have been an absolute sale of the stock, and the testimony shows that it was purchased by them with the agreement that upon payment for one share a second share should be delivered as bonus.  This as a basis for an estimate would warrant the conclusion that the stock was not worth to exceed 50 cents on the dollar at that time.  While, in the light of subsequent events, an assessment at a valuation of 50 cents on the dollar would appear to be high, the court knows of no way to determine how far subsequent events may have tended to a depreciation of this stock, and therefore determines that, in view of the fact that the company itself had, in this bona fide sale with third parties, trafficked with the stock at a valuation of 50 cents on the dollar, they should not be heard to complain at a valuation of the stock for assessment purposes at the same figure, and it is the decision of the court that in figuring said assessment this stock should have been valued as of January 1, 1911, at the sum of $28,800."

We agree fully with the general finding of fact by the trial court as here indicated. We think, however, that it does not sustain the final order made by the court. It is manifestly true that the stock had no market value in the ordinary sense. The sale of stock referred to in the finding of the trial court was to one Shallenberger, who appears to have been an existing stockholder. The sale to him was made by the company, presumably treasury stock, at 50 cents on the dollar. The comparative worthlessness of this stock as of January 1, 1911, is quite indisputable upon this record, even though the single sale in question was made at 50 cents on the dollar. The trial court seems to have based its final order upon the fact that the *company* had trafficked with a third party at the 50 cent price. This reason has in it a suggestion of a punitive assessment. If the appellant himself had sold his stock for such price, it might be appropriate to treat it as an admission on his part, and therefore sufficient evidence of value; but it does not appear that he sold it, nor that he had any more interest in the sale than such as accrued incidentally to any stockholder. It will hardly be contended that a sale by the company, even though wrongful or fraudulent, would of itself fix the assessable value of all of the stock as against all the stockholders. Under such rule, Shallenberger himself would be subject to assessment at the same rate for the same stock, even though he had been defrauded in the sale thereof. We find it impossible to believe, under this record, that the stock of this company approximated in value 50 cents on the dollar; and find that the assessment, therefore, was excessive. It seems to be conceded in the record, however, that for 1912 and 1913 the appellant himself valued his stock to the assessor at $16 per share, and it was so assessed against him. We are disposed to treat this as a solemn admission on his part, and to look no deeper into

the evidence of solvency. We are satisfied that such valuation was quite the maximum.

The order of the district court will be modified accordingly, and the valuation of stock will be fixed at $16 per share.—*Modified and Affirmed.*

GAYNOR, C. J., LADD and SALINGER, JJ., concur.